**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM PIROLLI | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 25-1881 |
| | : | |
| PHILADELPHIA PARKING | : | |
| AUTHORITY | : | |

## <u>MEMORANDUM</u>

KEARNEY, J.                                                    October 29, 2025

An experienced male employee hoping for a promotion with his former supervisor's support did not perform anywhere near as well as a less-experienced female employee seeking the same promotion based on an aptitude test, an interview process, and defined neutral factors. The man's results are about forty points (out of a hundred) less than the woman applicant. The employer promoted the less-experienced, but better performing, woman. The man now argues his employer's decision to select the better candidate over him is intentional sex-based discrimination. He offers a variety of speculative theories unsupported by record evidence. But he still would not have outperformed the woman candidate even if we credit his speculative theories. So he challenges the structure of the selection process attempting to suggest inconsistencies in how his employer set the process hoping these alleged inconsistencies may suggest the employer harbored an anti-male bias. He claims the employer wanted to overcome reputed perceptions arising from sexual harassment allegations against a former executive director five years before the Authority's decision to promote the higher performing woman applicant.

But he offers speculative theories without evidence. And we decide whether there are genuine issues of material fact requiring our jury's review based on evidence. We find no genuine issues of material fact. We enter judgment as a matter of law in favor of the employer. The

employer chose performance rather than seniority for this position. We do not second-guess these decisions absent genuine issues of material facts allowing a jury to find the employer discriminated against an experienced male employee when choosing a less-experienced woman employee who performed markedly better on a performance metric unchallenged before the promotion decision.

## I.    Undisputed Facts[1]

William Pirolli began his career at the Philadelphia Parking Authority over twenty-three years ago, working his way up through the Authority's Procurement Department with his supervisors ultimately promoting him to Manager of the Procurement Department in January 2019.[2] Mr. Pirolli reported to the Authority's Director of Procurement Ernie Rodriguez as the Manager of Procurement.[3]

Director Rodriguez announced in March 2021 of his plan to retire on September 1, 2021.[4] Director Rodriguez believed Mr. Pirolli should be his successor and the Authority should simply appoint Mr. Pirolli to fill the Director position without posting the job vacancy.[5] The Authority instead chose to post the Director position seeking applicants.

### *The Authority sets the selection process for the Director of Procurement position.*

The Authority sought applicants to replace retiring Director Rodriguez by preparing a Job Vacancy Announcement for the Director position.[6] The Authority's Executive Director Scott Petri edited the "Minimum Acceptable Training, Experience, and Education" section of the Job Vacancy Announcement by changing "BA/BS degree required" to "BA/BS degree preferred" and adding "Knowledge of [financial software program] Great Plains preferred."[7]

The Authority posted the Director of Procurement Job Vacancy Announcement in June 2021.[8] Fifteen persons applied for the Director position, including Mr. Pirolli and Mary Wheeler, then the Authority's Manager of Contract Administration.[9] As of June 2021, Mr. Pirolli had a total

of nineteen years of employment with the Authority and Ms. Wheeler had nine years of employment with the Authority.[10] Chief Financial Officer Belinda Smith selected Mr. Pirolli and Ms. Wheeler to go forward for further final consideration.[11]

The Authority required knowledge, skill, and abilities, minimum acceptable training, experience, and education for this position. It also described the "Selection Process" for internal candidates identifying four areas of assessment: (1) a computerized assessment test worth 30%; (2) an oral interview worth 60%; (3) attendance worth 5%; and (4) latest annual performance evaluation worth 5%.[12] The Authority recognized the value of seniority; internal applicants with at least ten years of service with the Authority, like Mr. Pirolli, received four points added to their total score.[13] The Authority required applicants must attain a combined total score of 70 from the four assessment areas to be eligible for promotion.[14]

### The Authority evaluates Mr. Pirolli and Mary Wheeler through a defined assessment rubric.

The two heaviest weighted scoring factors—the aptitude test (computerized assessment test) and the oral interview—made up 90% of the total score. Mr. Pirolli and Ms. Wheeler each took the Authority's computerized assessment test in early September 2021.[15] Mr. Pirolli did not adduce evidence or even suggest he challenged the method for selecting the next Director before the results.

The aptitude test consisted of two parts; drafting a letter in Microsoft Word and completing tasks in Microsoft Excel.[16] The Authority did not include skill with Microsoft Word or Microsoft Excel as a requirement in its Job Vacancy Announcement.

Mr. Pirolli's résumé submitted with his application for the Director position listed a certificate in "Microsoft Excel for Purchasing Professional."[17] Mr. Pirolli swore no one working

in the Authority's Procurement department used Excel during the time Former Director Rodriguez held the Director position.[18]

Mr. Pirolli scored a total of 36 on the aptitude test.[19] The weight given to the aptitude test under the rubric is 30%, bringing Mr. Pirolli to a score of 10.8.[20] Ms. Wheeler scored a total of 100 on the aptitude test, bringing her score (applying 30% weight) to 30.[21]

The Authority then interviewed Mr. Pirolli and Ms. Wheeler. The Authority selected its Executive Director Petri, Deputy Executive Director Clarena Tolson, Deputy Executive Director Corinne O'Connor, Chief Financial Officer Smith, and Senior Director of Human Resources Antonina Miller to interview Mr. Pirolli and Ms. Wheeler on September 17, 2021. A day before the interviews, the by-then-retired former Director Rodriguez sent a letter to Deputy Executive Director O'Connor endorsing Mr. Pirolli for the Director position and copied Senior Director of Human Relations Miller, Chief Financial Officer Smith, and the Authority's Board of Directors.[22] The then-retired former Director Rodriguez offered his opinion Mr. Pirolli should be promoted to the Director position, offered his opinion an assessment of Excel skills is not "a fitting measure of the knowledge or ability of the person to lead Procurement," and expressed being "insulted [he] was not able to be part of the test preparation, interview process or even allowed to offer an opinion of how the process should take place."[23]

The interview panel asked both Mr. Pirolli and Ms. Wheeler the same seventeen questions, assigning a score from zero to three based on their answers.[24] One of the seventeen questions asked Mr. Pirolli and Ms. Wheeler about their familiarity with "procurement systems and running reports."[25] Mr. Pirolli outscored Ms. Wheeler 11 to 6.5 because of his knowledge of Microsoft Dynamics GP.[26] But Ms. Wheeler outscored Mr. Pirolli on the other sixteen other questions.[27]

The Authority's Manager of Human Resources Darryl White tabulated the interview scores submitted by each interview panel member resulting in a total score of 114.5 for Mr. Pirolli and a total score of 206.5 for Ms. Wheeler.[28]

And the interviewers' testimony confirms the disparity in performance. Executive Director Petri testified Mr. Pirolli "stumbled on all kinds of questions," including "[s]ome of the basics," Mr. Pirolli "had no sense of what the department was about," "there were a couple of questions he couldn't answer," Deputy Executive Director Tolson "help[ed] him walk through the question … trying to help him, explain it," and "[g]ave him multiple opportunities," and "on one or two [questions] he even said I don't have an answer."[29] Executive Director Petri swore Ms. Wheeler "apparently had taken it upon herself to take a lot of outside coursework," "[s]he could answer all the questions thoroughly," "[o]ne [question] she had a little trouble with, but kind of, I think I was satisfied," and she "[c]ertainly had a sense of what the department should be like and what needed to happen in order to get there," and he "thought her interview was candidly very, very, very good."[30] Mr. Pirolli described the questions asked of him related to procurement or running a department during the interview as unfair.[31]

Mr. Pirolli and Ms. Wheeler each received five points for attendance; Mr. Pirolli received five points based on his most recent annual performance review; Ms. Wheeler received 4.5 points based on her most recent annual performance review; and Mr. Pirolli received four additional points for his seniority.

*Ms. Wheeler earned over forty more points in the total score.*

Mr. Pirolli and Ms. Wheeler received the following scores:[32]

| Category | Mr. Pirolli | Ms. Wheeler |
|---|---|---|
| Aptitude test (30%) | 10.8 | 30 |
| Oral interview (60%) | 21.6 | 48 |
| Attendance (5%) | 5 | 5 |
| Latest annual performance review (5%) | 5 | 4.5 |
| Seniority | 4 | 0 |
| **Total** | **46.4** | **87.5** |

Manager of Human Resources White tabulated the scores on the evening of September 22, 2021 and emailed Senior Director of Human Resources Miller, Chief Financial Officer Smith (to whom the new Director of Procurement would report), and Executive Director Petri.[33]

Chief Financial Officer Smith responded to Manager White, Senior Director Miller, and Executive Director Petri: "Based on the overall score I request that the offer for Director Procurement position be extended to Mary Wheeler. Does HR notify the applicant or do I? Also, what would be the earliest effective date?"[34] Manager White responded to Senior Director Miller, Chief Financial Officer Smith, and Executive Director Petri a conditional offer will be made to Ms. Wheeler pending the "pre-employment process."[35] The Authority offered Ms. Wheeler the Director of Procurement position on September 28, 2021.[36]

*Mr. Pirolli asserts sex-based discrimination after Ms. Wheeler's promotion.*

Mr. Pirolli did not like the decision. He timely complained to the Pennsylvania Human Relations Commission on December 6, 2021, dual-filed with the Equal Employment Opportunity Commission, asserting sex-based discrimination in the Authority's failure to promote him to the Director of Procurement position.[37] The Equal Employment Opportunity Commission issued Mr. Pirolli a right-to-sue letter on January 13, 2025 and he timely filed his complaint here on April 11, 2025.[38]

Mr. Pirolli alleged the Authority denied him the promotion to the Director of Procurement position because of his sex in violation of Title VII, the Pennsylvania Human Relations Act, and the Philadelphia Fair Practices Ordinance. Mr. Pirolli alleged Ms. Wheeler did not qualify for the Director of Procurement position because she did not have a license for, and working knowledge of, Microsoft Dynamics GP ("Great Plains") listed in the "Minimum Acceptable Training, Experience, and Education" section of the Job Vacancy Announcement. Mr. Pirolli alleged the aptitude test included a section on Microsoft Excel proficiency not listed as a required or preferred skill. Mr. Pirolli alleged the Authority included Excel proficiency to hide Ms. Wheeler's lack of qualifications for the Director position evidencing pretext in the Authority's promotion decision.

## II.    Analysis

The Authority now moves for summary judgment following extensive discovery. Mr. Pirolli opposes the motion. We find no genuine issue of material fact and enter judgment in favor of the Authority as a matter of law.[39]

Congress, through Title VII, makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, **because of** such individual's … sex."[40] Mr. Pirolli alleges disparate treatment based on his sex; the Authority promoted the less-qualified Ms. Wheeler over him because he is a man. The heart of a disparate treatment claim is an individual in a protected class is treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII.[41]

We are guided by the Supreme Court's seminal *McDonnell Douglas* burden-shifting analysis.[42] Mr. Pirolli must first establish a prima facie of discrimination: he must show (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse

employment action; and (4) the action occurred under circumstances which could give rise to an inference of intentional discrimination.[43] The prima facie test "is not onerous" and is a "burden easily met."[44]

If Mr. Pirolli meets his burden of establishing a prima facie case of discrimination, the burden shifts to the Authority to articulate a legitimate, non-discriminatory reason for its adverse employment action.[45] If the Authority meets its burden, the burden shifts back to Mr. Pirolli to show the Authority's "proffered reason is merely pretext for intentional discrimination."[46] To show pretext, Mr. Pirolli "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [the Authority's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Authority's] action."[47] Under the *McDonnell Douglas* burden-shifting framework, "the ultimate burden of proving intentional discrimination always rests with the plaintiff."[48]

The Authority first argues Mr. Pirolli's sex-based discrimination claim fails as a matter of law because he cannot establish a prima facie case of sex-based discrimination. It then contends even if Mr. Pirolli could establish a prima facie case, the Authority had a legitimate, non-discriminatory reasons for its promotion decision to hire the better candidate based on the neutral testing and there is no evidence its reasons are pretext for discrimination. The Authority also argues Mr. Pirolli's claims under the Pennsylvania Human Relations Act and the Philadelphia Fair Practices Ordinance fail for the same reasons as his Title VII discrimination claim, the Philadelphia Fair Practices Ordinance claim is not exhausted, and punitive damages cannot be recovered against the Authority.

Mr. Pirolli responds the Authority passed him over for a promotion in response to the public and scandal-ridden resignation nine years ago of its former Executive Director Vince Fenerty in the wake of sexual harassment allegations. Mr. Pirolli argues he is objectively more qualified, skilled, and experienced than Ms. Wheeler but the Authority hired her over him and argues summary judgment must be denied because the jury could infer the Authority hired a woman over him to counter its public perception problem created by Mr. Fenerty's conduct. He finds fault with the Authority's conduct, including "exclusion" of the retired former Director Rodriguez from the selection process, while ignoring the objective metric Ms. Wheeler outperformed him in the two major assessment categories.

Our role is not to sit as "a super-personnel department" reviewing the Authority's promotion decision.[49] Our role is to determine whether there is record evidence from which a jury could infer the Authority's proffered reason for selecting Ms. Wheeler for promotion over him is a pretext for sex-based discriminatory animus.

### A. Mr. Pirolli does not adduce evidence of a prima facie case of sex-based discrimination.

The Authority first argues Mr. Pirolli cannot establish the second and fourth elements of the prima facie case. Mr. Pirolli establishes the second element but not the fourth.

#### *Mr. Pirolli established he is qualified for the position.*

The second element requires Mr. Pirolli to show he is qualified for the position. Our Court of Appeals instructs qualification for the position means having "the requisite skill, experience, education, and other job-related requirements of the position."[50] At the prima facie stage, we ask whether Mr. Pirolli possessed "the minimal objective qualifications for the position."[51]

The Authority puts a twist on its argument; it argues Mr. Pirolli cannot demonstrate his qualification for **promotion** to the Director of Procurement position because he did not receive the

requisite 70 points on the selection rubric to be "placed on the promotional eligibility list." Executive Director Petri swore Mr. Pirolli met the qualification for the position "or he would not have been interviewed" but "did not meet the level of sophistication that I thought we needed and there was a better candidate."[52] But this goes to the Authority's argument it had a legitimate, non-discriminatory reason to select Ms. Wheeler over Mr. Pirolli for promotion—the second step of the *McDonnell Douglas* framework— not whether Mr. Pirolli established a prima facie case at the first step of the framework.

There is no dispute Mr. Pirolli had nineteen years of experience in the Procurement Department with favorable performance reviews. There is sufficient evidence from which a reasonable jury could find Mr. Pirolli qualified for the position. We conclude he meets the second element of the prima facie case.

### Mr. Pirolli did not establish the Authority's decision occurred under circumstances raising an inference of discrimination.

The fourth element of the prima facie case under *McDonnell Douglas* requires Mr. Pirolli show the Authority's promotion of Ms. Wheeler over him occurred under circumstances which could give rise to an inference of discrimination. Mr. Pirillo may establish the fourth element by pointing to evidence the Authority's promotion of Ms. Wheeler over him, taken together with the circumstances, "could give rise to an inference of intentional discrimination."[53]

Mr. Pirolli asserts there is sufficient record evidence the Authority's action occurred under circumstances raising an inference of discrimination: (1) the Authority promoted Ms. Wheeler five years after former Director Vince Fenerty resigned in the wake of allegations of his sexual harassment of female subordinates in 2016 to combat its image problem; and (2) other qualified men were passed over in favor of less qualified or less experienced women.

In support of his first argument—the Authority's public perception problems caused by former Director Fenerty's conduct—Mr. Pirolli points to Executive Director Petri's testimony:

Q. "Do you agree with me that one of the ways to combat a perception that women were not treated well at the [Authority] is to put a woman into a leadership role?"

A. "I don't know. I think that's a [B]oard decision, but it might, it might have a positive impact. It may not. I think it depends on whether there is a real subsequent change or not."[54]

Mr. Pirolli contends we may infer intentional discrimination from Executive Director Petri's response. Executive Director Petri initially responded he did not know if he agreed with the question. He then responded hiring "a woman into a leadership role" is a Board decision and it "might" or "it may not" have a positive impact on a perception the Authority did not treat women "well." Mr. Pirolli asks us to assume the Authority had a public relations problem five years after Mr. Fenerty's resignation as the Executive Director, the Authority decided to promote Ms. Wheeler to the Procurement Director position solely to combat its public relations problem, and the evidence is Executive Director Petri's testimony essentially speculating the hiring of a woman to a leadership role might or might not have a positive impact on "a perception"—assuming such a perception exists by presumably the public at large—the Authority did not treat women "well." This reach is pure conjecture.

The other evidence on which Mr. Pirolli relies is an assertion the Authority passed over "other qualified males" in favor of less qualified or experienced women. Mr. Pirolli points to another employee, Jonathan McGuire, who lost out on a promotion as the Authority's Chief Financial Officer to Belinda Smith.

Mr. Pirolli relies on former Director Rodriguez's deposition testimony of being "aware" of a "couple of things" involving unidentified employees in risk management at some time before or after his retirement and former Director Rodriguez's belief Mr. McGuire "should have been

11

promoted" to the finance position but the Authority passed him over in favor of a "less qualified woman."[55] Former Director Rodriguez also testified two other male employees expressed "surprise" the Authority selected Ms. Wheeler over Mr. Pirolli and these two employees believed Mr. Pirolli "should have been selected."[56]

Mr. Pirolli also relies on his own testimony Mr. McGuire believed the Authority selected Ms. Smith to fill the Chief Financial Officer position over him (Mr. McGuire) because Mr. McGuire is a man and recounted a comment Executive Director Petri made to Mr. McGuire "diversity is a wonderful thing."[57] But, when asked, Mr. Pirolli admitted he did not know anything about the Authority's decision to hire Ms. Smith over Mr. McGuire, did not speak to another man passed over for a project manager position, did not speak to Executive Director Petri about Ms. Smith's promotion, and did not communicate to a current employee at the Authority his belief he did not get the Procurement Director position because he is a man.[58] Mr. Pirolli chose to not depose Mr. McGuire so we are left without supporting evidence.

The speculations of Former Director Rodriguez and Mr. Pirolli's testimony repeating Mr. McGuire's thoughts regarding the Authority's hiring of Ms. Smith—which Mr. Pirolli admittedly knowns nothing about—do not give rise to an inference of intentional discrimination.

We conclude Mr. Pirolli fails to meet his burden on the fourth element of the prima facie case.

**B.  Mr. Pirolli cannot show a fact issue on pretext.**

Even if Mr. Pirolli met his burden at the prima facie stage, we find a legitimate non-discriminatory reasons for promoting Ms. Wheeler as the better candidate for the Director position. Under the second step of the *McDonnell Douglas* burden-shifting analysis, the Authority must articulate a legitimate, non-discriminatory reason for its promotion of Ms. Wheeler. If the

Authority meets its burden, the burden shifts back to Mr. Pirolli to show the Authority's reasons is pretext for intentional discrimination.

The Authority's proffered reason for promoting Ms. Wheeler to the Director position is because she outperformed Mr. Pirolli during the selection process and is the better candidate. The Authority points to the two heaviest weighted factors: the aptitude test and the interview. There is no dispute Ms. Wheeler scored 100 on the test and Mr. Pirolli scored 36 on the aptitude test. Applying the 30% value, Ms. Wheeler received 30 points toward her total score and Mr. Pirolli received 10.8 toward his total score. There is no dispute Ms. Wheeler scored a total of 80 from her interview and Mr. Pirolli received a 36 from his interview. Applying the 60% value, Ms. Wheeler received 48 points toward her total score and Mr. Pirolli received 21.6 toward his total score. There is no dispute Ms. Wheeler received a total score of 87.5 and Mr. Pirolli received a total score of 46.4.

Having outscored Mr. Pirolli in the two most heavily weighted factors (including the addition of an extra four points added to Mr. Pirolli's score for seniority not received by Ms. Wheeler), the Authority selected Ms. Wheeler for the Director position. Mr. Pirolli must point to evidence from which a jury could reasonably either disbelieve the Authority's reason or believe an invidious discriminatory reason was more likely than not a motivating or determinative cause of Authority's decision. He must point to evidence "demonstrating…weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Authority's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence' … and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'"[59] The burden remains on Mr. Pirolli to prove intentional discrimination.

Mr. Pirolli argues a jury must decide whether the reason for promoting Ms. Wheeler over him is pretext because the Authority (including five members of the interview panel four of whom are women) infected the selection process to combat the Authority's public image and we cannot accept the Authority's reason for promoting Ms. Wheeler based on her superior performance.

Mr. Pirolli offers varied pretext arguments:

- Mr. Pirolli is objectively more qualified than Ms. Wheeler;

- the selection criteria in the Job Vacancy Announcement imposing an eligibility of 70 is illusory because the Authority, through Executive Director Petri, could have selected whomever he wanted for the position regardless of scoring and the Authority has a "penchant" for ignoring its own policies and procedures;

- the inclusion of Excel testing on the aptitude test had no relevance to the Director position and the jury could conclude Executive Director Petri wanted an Excel test to "help tip the scales" in favor of the female candidate Ms. Wheeler;

- the Authority did not consider, and ignored, former Director Rodriguez's opinion Mr. Pirolli should be promoted;

- the interview process was subjective;

- the Authority failed to ensure the members of the interview panel evaluated or scored the answers to the interview questions consistently;

- the Authority fails to take its written policies, including its Equal Employment Opportunity policy "seriously;"

- the five members of the interview panel gave inconsistent stories as to the identity of the decision-maker; and

- the Authority and its witnesses have "repeatedly demonstrated their untruthfulness throughout this litigation."

We address these arguments, many of which overlap, in turn. We find Mr. Pirolli does not meet his burden to show the Authority's reason for hiring Ms. Wheeler is pretextual and enter judgment in favor of the Authority.

1. **Mr. Pirolli's aligned arguments he is "objectively" more qualified than Ms. Wheeler and the Authority skewed its selection process to favor Ms. Wheeler by including testing Excel skills and using a flawed interview process is not supported by the record and does not show pretext.**

Mr. Pirolli's primary argument is he is, without dispute (in his view), objectively more qualified for the Director position than Ms. Wheeler but the Authority selected her for promotion over him because of the public relations damage caused by former Director Fenerty's sexual harassment of female subordinates in 2016. Mr. Pirolli concludes he is objectively more qualified than Ms. Wheeler because he: (a) had eighteen years of experience in the Procurement Department while Ms. Wheeler had no experience in Procurement; (b) received three promotions during his tenure at the Authority while Ms. Wheeler did not receive a promotion; (c) had a total of ten more years of experience than Ms. Wheeler; and (d) is an "expert" in Microsoft Dynamics GP while Ms. Wheeler had no knowledge or experience.

If we accepted Mr. Pirolli's argument, every person who has more seniority, more promotions, and more experience would always be more qualified than any other applicant regardless of the candidate's performance in the selection process effectively removing from the Authority any choice in selecting the best candidate. Seniority would always win rather than performance. We are not persuaded this theory creates a disputed fact for the jury's determination.

### *The Microsoft Dynamics GP issue.*

Mr. Pirolli focuses on Ms. Wheeler's lack of working knowledge of Microsoft Dynamics GP, included as a "minimum[ally] acceptable" criterion on the Job Vacancy Announcement. But the record shows Executive Director Petri swore he included knowledge of Microsoft Dynamics GP as a preferred skill because he thought it to be an "enhancement" and "would be helpful" to a candidate, "shortens the learning curve," and "like every other software package, you can learn it."[60] Microsoft Dynamics GP is also not the only factor in the criteria; for example, a Batchelor's

degree is preferred which Mr. Pirolli does not have. Mr. Pirolli did not adduce evidence suggesting pretext based on Ms. Wheeler's learning curve with a software program.

### *The aptitude test using Microsoft Excel.*

Mr. Pirolli also tries to focus on the Authority's use of an aptitude test assessing Microsoft Excel skills—a program he believes is irrelevant to the work of the Procurement Department—to benefit Ms. Wheeler. He contends knowledge of Microsoft Excel is not listed as a required skill on the Job Vacancy Announcement and the inclusion of Microsoft Excel on the computer assessment test is somehow skewed to benefit women over men. Even if we accepted his speculative argument and assume he scored 100 on the aptitude test (as Ms. Wheeler did), his total score would go from 46.4 to 65.6, and he would still be twenty points below Ms. Wheeler's total score of 87.5.

### *Speculation around the interview questions.*

Mr. Pirolli argues the Authority failed to act to ensure the five members on the interview panel evaluated and scored their answers consistently, failed to give the panel members guidance or training, and failed to ensure the panel members had a consistent understanding of the scoring or what should or should not be considered. Mr. Pirolli contends the Authority did not guarantee the panel members could not consider protected characteristics like gender in the interview process and did not ask panel members to explain or justify the scores they assigned to Mr. Pirolli and Ms. Wheeler. And Mr. Pirolli—based on these arguments—asks us to find a jury could reasonably disbelieve the Authority's promotion of Ms. Wheeler as having outperformed him in the interview process or believe an invidious discriminatory reason is more likely than not a motivating or determinative cause of its promotion decision.

The reasonable inference we are asked to find here for the jury's determination is the Authority's lack of instruction or consistent evaluation guidelines automatically favors women over men and the Authority treats women interviewing for a position more favorably than men interviewing for a position. Mr. Pirolli does not adduce evidence the Authority used a different interview method or instructed interview panel members in scoring considerations with male candidates making the interview process more difficult or somehow more unfair for men rather than women. We have no basis to leap to a conclusion the interview panel somehow designed the questions to ensure a female applicant would obtain this position. Speculation does not carry the day for Mr. Pirolli.

### Mr. Pirolli's belief the Authority could have just appointed him rather than going through the Job Vacancy posting process in which Ms. Wheeler outperformed him.

Mr. Pirolli argues the Authority's Standard Operating Procedures for Hiring & Promotion includes a provision its Vacancy Review Panel "may elect to select someone" for a Director-level position "without posting from among current employees or from outside the Authority."[61] The Authority may also choose to post an opening for a vacant position.

Mr. Pirolli argues the fact the Authority, through Executive Director Petri, ***could have*** selected him for the Director position without posting for the vacancy left by former Director Rodriguez's retirement demonstrates gender bias and shows the Authority's "penchant" for ignoring its own policies and procedures. Mr. Pirolli argues the Authority intentionally ignored former Director Rodriguez's disagreement with the selection process and his opinion Mr. Pirolli should be selected for the Director position. The decision to not include former Director Rodriquez, according to Mr. Pirolli, is contrary to the Authority's process in other instances where the opinion of the incumbent is considered.

For example (and the only example cited by Mr. Pirolli), Ms. Wheeler testified after her promotion to the Director of Procurement position, she sat on the interview panel to select her replacement as the Contract Administrator and believed, as the Director of Procurement,  the choice to select her replacement is "the normal process."[62] But Ms. Wheeler also testified she did not "identify" her replacement (a woman), the Authority "posted that position" and "[n]othing was guaranteed."[63] By contrast, former Director Rodriguez voiced his concern about the selection process after his retirement, he did not sit on the interview panel, and believed the Authority should have simply appointed Mr. Pirolli without posting the vacancy. We face speculation upon hope; these reaches are not evidence. We cannot reasonably infer intentional discrimination disregarding an extensive process based on speculative hypotheses.

We are far beyond allegations based on speculation. Mr. Pirolli must now affirmatively show us where in the record there is a genuine dispute of material fact. He may not use speculation and conjecture to defeat summary judgment.[64] He did not adduce a document showing the Authority used a Job Vacancy Announcement or selection process in a way to favor less-qualified women applicants over more-qualified male applicants. We appreciate his disappointment may fuel his speculation based on his time with the Authority; but this is a court of law based on evidence. And there is no evidence the Authority used the vacancy posting procedure to promote less-qualified women over more-qualified men. What the Authority could have done, the speculations of former Director Rodriguez, an aptitude test including skill on Excel which, even if Mr. Pirolli scored 100, still results in Mr. Pirolli's underperformance overall does not constitute evidence from which the jury could *reasonably* either disbelieve the Authority promoted Ms. Wheeler because she is the better candidate or an invidious discriminatory reason is more likely than not a motivating or determinative cause of the Authority's decision.

##### 2. Mr. Pirolli did not adduce a genuine issue of material fact allowing a jury to evaluate whether the Authority does not take its written policies, including its Equal Employment Opportunity policies, seriously.

Mr. Pirolli argues the Authority does not take its Standard Operating Procedures for Hiring & Promotion or its Equal Employment Opportunity policy seriously, which creates a fact issue about the Authority's discriminatory animus in its promotion decision. We scrutinized the evidence and find no genuine issue of material fact warranting the jury's review on the Authority disregarding its policies as evidence of intentional discrimination against men in promotions.

The Authority's Senior Director of Human Resources Miller, one of the five members of the interview panel, swore each member of the interview panel scored Mr. Pirolli and Ms. Wheeler independently, but Manager White (who compiled the scores) did not "record the interview scores on the Promotion Evaluation Checklist" required by Step 3 of the Authority's Standard Operating Procedures for Hiring & Promotions.[65] Senior Director Miller also swore the Authority did not follow other steps of the Standard Operating Procedure.[66] For example, Senior Director Miller testified Manager White complied the interview scores rather than the Senior Director as required by the Standard Operating Procedures, the Senior Director and Division Director did not present the recommendation of the evaluation panel to the Executive Director and Executive Deputy Directors, the Human Resources Committee Chair timely signed an approval the promotion but the Board Human Resources did not meet to review the promotion decision all required by the Standard Operating Procedures.[67]

The Authority's departure from its own procedures does "not necessarily suggest" it is motived by intentional discrimination or the reason for selecting Ms. Wheeler for promotion is pretextual.[68] The Authority's failure to do so could warrant an inference of pretext if we had something to connect the Authority's failure to follow its Standard Operating Procedures to

evidence men were treated differently than women with respect to the Authority's Procedures or undermining the Authority's choice to select Ms. Wheeler for the promotion because of her superior performance.[69]

Mr. Pirolli argues the Authority does not follow its Equal Employment Opportunity policy. He cites the testimony of Chief Financial Officer Smith (one of the five members of the interview panel) admitting she never read the Authority's Employee Handbook, no one at the Authority ever told her of an Employee Handbook, and no one at the Authority told her it had an Equal Employment Opportunity-related policy, and the Authority never offered her anti-discrimination training.[70] Mr. Pirolli does not connect how Chief Financial Officer Smith's equal employment opportunity training creates a fact issue regarding the Authority's decision to promote Ms. Wheeler based on her performance.

Mr. Pirolli also points to Senior Director of Human Resources Miller's testimony she received an email from Mr. Pirolli on December 6, 2021 advising her he filed a complaint of discrimination with the Pennsylvania Human Relations Commission.[71] Senior Director Miller testified she did not discuss Mr. Pirolli's administrative complaint with anyone at the Authority and the complaint procedure in the Authority's Employee Handbook was not followed with regard to Mr. Pirolli's administrative complaint because she understood "any kind of complaint that comes from an agency external needed to be sent to general counsel's office. So [she] sent this to general counsel's office."[72]

Accepting Mr. Pirolli's argument Senior Director Miller did not follow the complaint procedure in the Authority's Employee Handbook and instead forwarded his administrative complaint to the Authority's general counsel, he does not explain how Senior Director Miller's

failure to investigate (rather than the Authority's general counsel) is a pretext for intentional discrimination in promoting Ms. Wheeler based on her performance.

Mr. Pirolli also argues the Authority used the wrong scoring rubric: instead of the rubric it used in assessing him and Ms. Wheeler assigning 30% to the aptitude test; 60% to the interview; 5% to attendance; and 5% to the latest annual performance review plus four points for seniority, Mr. Pirolli asserts the Authority ***should have*** applied (under its Standard Operating Procedures for Hiring & Promotions) 50% to the aptitude (or assessment) test; 5% to attendance; 10% to the latest performance annual performance review; and 35% to the interview plus four points for seniority.[73] But even if we applied the rubric Mr. Pirolli believes should have been applied under the Standard Operating Procedures, and even assuming he scored 100 on the aptitude test, and adding four points for seniority he still would not have outscored Ms. Wheeler; he would have scored 81.6 total points to Ms. Wheeler's 92 total points.

Mr. Pirolli is obligated to today show a fact dispute on whether discriminatory animus motived the Authority's decision to promote Ms. Wheeler over Mr. Pirolli because he is a man. The issue is not whether the Authority's decision is wrong or mistaken, "wise, shrewd, prudent, or competent."[74] We find no genuine issues of material fact on the issue of pretext created by the Authority's failure to follow its own policies.

### 3. Alleged inconsistencies in who made the decision does not evidence pretext.

Mr. Pirolli contends the five members of the interview panel gave inconsistent testimony regarding the identity of the decision-maker or makers which is also inconsistent with the Authority's answers to interrogatories. He believes these inconsistencies show an "ever-changing representation" as to who made the decision to promote Ms. Wheeler evidencing pretext.

We disagree the record shows inconsistencies and, to the extent there are inconsistencies, they are not material.

Mr. Pirolli propounded an interrogatory asking the Authority to identify "each individual who *was involved in the decision* not to select [Mr. Pirolli] for the Director" position. The Authority identified the five members of the interview panel: Executive Director Petri; Deputy Executive Director Tolson; Deputy Executive Director O'Connor, Chief Executive Officer Smith; and Senior Director of Human Resources Miller.[75]

Mr. Pirolli deposed each of the five interview panel members; none of them denied being "involved in the [promotion] decision."

- **Executive Director Petri**: Mr. Pirolli's counsel asked Executive Director Piroli, "So the committee makes the decision based on the score, the interviews, and then you give the final approval, correct?"  Executive Director Petri responded, "Yes" and confirmed Deputy Executive Director Tolson, Deputy Executive Director O'Connor, Chief Executive Officer Smith, and Senior Director of Human Resources all served on the interview panel; he was involved in the interviewing; and, based on the tabulation of the results, the qualification provisions and scoring, he as Executive Director ultimately approved the Director of Procurement position.[76]

- **Deputy Executive Director Tolson**: Mr. Pirolli's counsel asked about Deputy Executive Director Tolson's involvement in both the decision to hire Ms. Wheeler over Mr. Pirolli and the selection decision. Deputy Executive Director Tolson responded, "I was involved in the interview process, yes" and described her role in the selection process as, "Yes [she was involved in the selection decision] because it would have been – you know, with the interviews, interviews we had to, you know, ask questions and kind of evaluate what was said" as part of the interview panel.[77] When asked, "Do you know who specifically made the decision at issue here?" Deputy

Executive Director Tolson responded, "I'm assuming that is was, you know, everybody on the interview panel and that it would have been, you know, a person in HR that would have done the tabulations."[78] Deputy Executive Director Tolson then expressed her misinterpretation of counsel's questions about her involvement in the selection process: "I misinterpreted how you are just defining it. So in different questions, maybe I am misinterpreting your question. So I can't say that I was not involved in the process of deciding who, because I was on the panel. But I was not involved --- if the selection process is figure out who had a score of 50, who had a score of 60, I was not involved in that. But I was on the interview panel."[79] Deputy Executive Director Tolson then testified "outside of the interview panel"—a component of the selection process—she did not have involvement in the promotion decision.[80]

Mr. Pirolli asserts as an undisputed fact Deputy Executive Director Tolson "was not involved in the decision to select [Ms.] Wheeler for the position over [Mr. Pirolli]" as evidenced by her testimony.[81] This mischaracterizes the record testimony. Deputy Executive Director Tolson testified to her involvement in both the interview process and selection process as a member of the interview panel with the interview being a component of the selection process. This is not inconsistent with the record evidence.

- **Deputy Executive Director O'Connor**: Mr. Pirolli's counsel asked Deputy Executive Director O'Connor, "Who made the decision to select [Ms.] Wheeler over Mr. Pirolli for that position?" Deputy Executive Director O'Connor responded, "Well, the interview process, it's a committee, and everybody scores the applicants individually and we don't see the other person's scores, and then it goes back and HR takes those scores and tabulates them and then they come back and let us know who scores the highest."[82] When asked again, "Who made the decision to select [Ms.] Wheeler over Mr. Pirolli?" Deputy Executive Director O'Connor responded, "I

mean, you're asking me for a specific person? … So it would be the committee. So once Darryl White comes back and says Mary [Wheeler] scored the highest, are you good with moving forward, then we all say yes or no."[83] Mr. Pirolli's counsel then asked, "So am I correct that you, [Deputy Executive Director Tolson], [Executive Director] Petri, [Chief Financial Officer] Smith, and [Senior Director of Human Resources] Miller were all decisionmakers in connection with the election of [Ms.] Wheeler over Mr. Pirolli for this position?" Deputy Executive Director O'Connor responded, "Yes."[84] Deputy Executive Director O'Connor's testimony is not inconsistent with the other interview panel members.

- **Chief Financial Officer Smith**: Chief Financial Officer Smith testified the decision to select Ms. Wheeler for the Director position "was a collaboration of the interviews that, that actually interviewed him. It was based on the scores from the interview" and the "group of – there were questions … but as the questions were asked then the question was rated, and based on the number of points that the individuals had, that was the individual that was selected."[85] Chief Financial Officer Smith agreed with Mr. Pirolli's counsel "not everyone" on the panel "were all involved in the decision to select Mary Wheeler over Bill Pirolli" because Deputy Executive Director O'Connor's "points were higher for Mr. Pirolli."[86] Mr. Pirolli argues this is inconsistent with the testimony of the other interview panel members. But this is a reach; Chief Financial Officer Smith testified to the five-member interview panel asking questions of the candidates which were then scored, and the Authority selected the highest scorer. She testified "not everyone" on the panel selected Ms. Wheeler over Mr. Pirolli, specifically noting Deputy Executive Director O'Connor's scores were higher for Mr. Pirolli. This is consistent with Deputy Executive Director O'Connor scored Mr. Pirolli a total of 33 points on the interview and a total of 30 points for Ms. Wheeler.[87]

- **<u>Senior Director of Human Resources Miller</u>**: Senior Director Miller testified to her involvement with scoring and interviewing of Ms. Wheeler and Mr. Pirolli as a member of the interview panel but identified Chief Financial Officer Smith made the decision to select Ms. Wheeler because the Director position reported to the Chief Financial Officer.[88] Mr. Pirolli argues this testimony is inconsistent with the other interview panel members.

Mr. Pirolli cites a decision from our Court of Appeals in *Cullen v. Select Medical Corporation* to support his inconsistency as evidence of pretext argument.[89] Mr. Cullen sued his former employer alleging discrimination under the Americans with Disabilities Act and the Family Medical Leave Act. Judge Pratter granted summary judgment in favor of the employer and Mr. Cullen appealed arguing Judge Pratter should have considered the employer's inconsistencies in the reasons for his firing, including why the employer made the decision and who made the decision.

Our Court of Appeals agreed with Mr. Cullen. It found inconsistencies in the reason for termination; the reason given by the employer cited performance as a factor but Mr. Cullen's supervisor and another executive testified performance was not a factor. Our Court of Appeals also found inconsistent explanations as to the decisionmaker; the employer's interrogatory responses identified the supervisor and other executives but those individuals denied making the decision except for the supervisor. And our Court of Appeals found inconsistencies in when the employer made the termination decision. Our Court of Appeals found this evidence showed the sort of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"[90]

For all the reasons explained, we conclude *Cullen* is factually distinguishable. Unlike *Cullen*, there are no inconsistencies in the reason for the promotion decision here, when the Authority made the decision, and who participated in the decision through the interview process. While inconsistent statements about the identity of the actual decisionmaker may be evidence of pretext, it is not always.

For example, Judge Ranjan rejected an employee's argument pretext can be inferred from inconsistencies in the identification of the employer's decisionmaker.[91] Employee Mr. Yoho argued documents identified one person as the decisionmaker but the decisionmaker denied being the sole decisionmaker. Judge Ranjan found the documents identified the individual as the "responsible," but not "sole," decisionmaker and the record showed the alleged "sole" decisionmaker "made his decision in consultation with human resources and with his own manager."[92] Judge Ranjan found he could not on summary judgment infer pretext from the alleged inconsistencies.

Judge Tucker rejected this same argument in *Harry v. National Railroad Passenger Corp.*[93] Employee Mr. Harry argued his employer improperly terminated him because of his disability. Mr. Harry opposed summary judgment arguing his employer identified its General Manager as the sole decisionmaker while Mr. Harry's supervisor testified he made the determination approved by the General Manager, an inconsistency suggesting pretext. Judge Tucker disagreed reasoning the record showed Mr. Harry's supervisor, product line manager, and General Manager consistently testified they relied on performance evaluations taken in anticipation of a reduction in force in making the employment decision. Judge Tucker found it "plausible that within the hierarchal structure of the [employer], in preparation for the reorganization, the [General Manager] identified [Mr. Harry] and informed the [product line manager] of his determination" and, "subsequently,

[the supervisor and product line manager] would meet with [Mr. Harry] directly to inform him of his termination."[94] Judge Tucker found Mr. Harry did not show an inconsistency sufficient to create a genuine issue of material fact on pretext.

We disagree the testimony of the five interview panel members, considered in their entirety, create an inconsistency and "shifting explanations" for the Authority's decision to promote Ms. Wheeler or is suggestive of pretext. All of the members testified they had some input into the promotion decision as members of the interview panel. Senior Director Miller attributed the final decision to Chief Financial Officer Smith rather than Executive Director Petri. But there are no discrepancies all the panel members assessed and scored the responses to the same seventeen questions asked during the oral interview section of the selection process, there is no discrepancy as to who scored higher, and there is no discrepancy among the interviewers the Authority's reason for Ms. Wheeler's selection is because of her better performance.

There must be more than a possibility a jury might disbelieve the Authority's reason for its promotion decision. Mr. Pirolli must adduce some evidence showing "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in the Authority's proffered legitimate reason for its decision from which the jury "could rationally find them 'unworthy of credence.'"[95] Mr. Pirolli did not meet his burden to establish pretext by asserted inconsistencies sufficient for a jury to either disbelieve the Authority's articulated legitimate reason for promoting Ms. Wheeler or believe an invidious discriminatory reasons is more likely than not a motivating or determinative cause of the Authority's decision.[96]

## III.  Conclusion

Mr. Pirolli does not adduce evidence allowing us to find a genuine issue of material fact for a jury to evaluate whether the Authority intentionally discriminated against him because it

27

hoped to combat a public perception problem five years before its decision to promote Ms. Wheeler who overwhelmingly outperformed him in the selection process. We appreciate Mr. Pirolli believes seniority and not performance on a test should ensure his promotion. But we are not the employer. We do not second-guess their processes absent evidence of intentional discrimination. Mr. Pirolli does not offer a basis after fulsome discovery to submit genuine issues of material fact to the jury. We grant the Authority's Motion for summary judgment.

---

[1] Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a Statement of Undisputed Material Facts ("Authority SUMF") and an appendix in support of summary judgment. The Philadelphia Parking Authority filed its Motion, Statement of Undisputed Material Facts, Memorandum in support of summary judgment, and Appendix ("Appx.") at ECF 25, 25-1, and 25-2 through 25-5. Mr. Pirolli opposed the motion, responded to the Authority's SUMF, included an Additional Statement of Undisputed Material Facts ("Pirolli SUMF"), and added a supplemental Appendix at ECF 26, 26-1, 26-2, 26-5 through 26-36. The Authority filed a reply brief at ECF 27.

[2] ECF 26-1, Response to Authority SUMF ¶¶ 3–5, 7.

[3] *Id.* ¶ 9.

[4] *Id.* ¶ 10; ECF 26-2, Pirolli SUMF ¶ 58.

[5] ECF 26-2, Pirolli SUMF ¶ 126.

[6] ECF 26-1, Response to Authority SUMF ¶ 11. Mr. Pirolli disputes the use of the words "prepared" and "in light of Mr. Rodriguez's pending retirement" as not having record cites. This is not a material dispute.

[7] ECF 25-1, Authority SUMF ¶¶ 13–14; ECF 25-3, Appx. 63–64. Mr. Pirolli did not attain a bachelor's degree. "Great Plains," known as Microsoft Dynamics GP, is a financial software system used by the Authority. ECF 25-1, Authority SUMF ¶ 13. The final version of the Job Vacancy Announcement listed the Great Plains requirement as "Working knowledge of Microsoft Dynamics GP." ECF 25-3, Appx. 65-66. Mr. Pirolli concedes Executive Director Petri testified he made handwritten changes to the Job Vacancy Announcement but disputes Executive Director Petri made only two changes. Mr. Pirolli does not cite record evidence supporting an inference Executive Director Petri made more than two changes and, if he did, how it is a material fact.

[8] ECF 26-1, Response to Authority SUMF ¶ 15; ECF 25-3, Appx. 65–67.

[9] ECF 26-1, Response to Authority SUMF ¶ 31.

---

[10] ECF 26-2, Pirolli SUMF ¶¶ 1–4, 138–143.

[11] ECF 26-1, Response to Authority SUMF ¶ 32.

[12] ECF 26-1, Response to Authority SUMF ¶ 17; ECF 25-3, Appx. 66.

[13] ECF 26-1, Response to Authority SUMF ¶ 18; ECF 25-3, Appx. 66.

[14] *Id.*

[15] ECF 26-1, Response to Authority SUMF ¶¶ 34–37.

[16] *Id.* ¶ 34.

[17] ECF 26-1, Response to Authority SUMF ¶ 74.

[18] ECF 26-2, Pirolli SUMF ¶ 115.

[19] ECF 25-2, Appx. 364.

[20] *Id.*

[21] *Id.*

[22] ECF 26-21, Appx. 525–26; ECF 26-2, Pirolli SUMF ¶ 117. The Authority asserts in its SUMF former Director Rodriguez contacted Executive Director Petri before the interviews to recommend Mr. Pirolli for the Director Position. ECF 25-1, Authority SUMF ¶ 28. Mr. Pirolli disputes this (citing nothing in the record to refute Executive Director Petri's sworn testimony) because Executive Director Petri's credibility "is in issue in this case." ECF 26-1, Response to Authority SUMF ¶ 28. But in his supplemental SUMF, Mr. Pirolli relies on Executive Director Petri's testimony to assert as facts: former Director Rodriguez approached Executive Director Petri before the interviews to "tell [Executive Director Petri] that [Mr. Pirolli] should get the [Director] position"; Executive Director Petri "had no reason to doubt [Former Director] Rodriguez's honesty or integrity" in making his recommendation; Executive Director Petri did not document his conversation with Former Director Rodriguez; Executive Director Petri "understood from his conversation with [Former Director] Rodriguez that [Former Director] Rodriguez had trained [Mr. Pirolli] to be his successor, in the context of a more formal succession planning process that [Executive Director] Petri had implemented during his employment"; and Executive Director Petri did not share with the other members of the interview panel Former Director Rodriguez's thoughts on his successor. ECF 26-2, Pirolli SUMF ¶¶ 63–67.

Mr. Pirolli cannot have it both ways; he cannot dispute Executive Director Petri's testimony based on credibility while at the same time seemingly relying on the same testimony to support facts to defeat summary judgment.

[23] ECF 26-21, Appx. 526.

[24] ECF 26-1, Response to Authority SUMF ¶¶ 38–39.

[25] ECF 25-5, Appx. 251, 255, 259, 263, 267, 271, 275, 279 (Question 3).

[26] ECF 26-1, Response to Authority SUMF ¶¶ 48–49.

[27] *Id.*

[28] ECF 26-1, Response to Authority SUMF ¶¶ 45–47. Out of a total of fifty-one points per panel member (a maximum of three for each of the seventeen questions), the interview panel members scored Mr. Pirolli as follows: Executive Director Petri–24 points; Chief Financial Officer Smith–22 points; Senior Director of Human Resources Miller–19.5 points; Deputy Executive Director O'Connor–33 points; and Deputy Executive Director Tolson–16 points. *Id.* ¶ 46.

The interview panel members scored Ms. Wheeler as follows: Executive Director Petri—43.5 points; Chief Financial Officer Smith–42 points; Senior Director of Human Resources Miller–49 points; Deputy Executive Director O'Connor–30 points; and Deputy Executive Director Tolson—42 points. *Id.* ¶¶ 47–49.

[29] *Id.* ¶ 50.

[30] ECF 26-1, Response to Authority SUMF ¶ 51. Senior Director of Human Resources Miller swore to a similar impression of both Mr. Pirolli and Ms. Wheeler. *Id.* ¶ 52.

[31] *Id.* ¶¶ 41–42, 53.

[32] *Id.* ¶¶ 57–58; ECF 25-5, Appx. 364.

[33] ECF 25-5, Appx. 366.

[34] *Id.*

[35] *Id.*

[36] ECF 26-1, Response to Authority SUMF ¶ 62.

[37] ECF 1, Complaint ¶ 15.

[38] *Id.* ¶ 16.

[39] Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (citation omitted). The "mere existence of a scintilla of evidence" favoring the nonmoving party

does not prevent summary judgment. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). When determining whether a disputed fact is genuine, we draw all inferences in favor of the non-moving party. *Id.* We do not weigh evidence or make credibility determinations. *Spivack v. City of Phila.*, 109 F.4th 158, 165-66 (3d Cir. 2024) (citing *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021)).The Supreme Court "outlined two closely related methods for a movant to succeed at summary judgment": (1) under the "standard approach," the moving party may produce material facts, genuinely undisputed, entitling it to judgment as a matter of law; and (2) under the "*Celotex* approach," the moving party "may instead demonstrate that the nonmoving party has not made 'a showing sufficient to establish the existence of an element essential to that party's case … *on which that party will bear the burden of proof at trial*." *Mall Chevrolet, Inc. v. General Motors LLC*, 99 F.4th 622, 630 (3d Cir. 2024) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is appropriate where the nonmoving party does not make a showing sufficient to establish the existence of an element essential to his case and on which he bears the burden of proof at trial. *SodexoMAGIC*, 24 F.4th at 204 (citing *Celotex Corp.*, 477 U.S. at 322).

[40] 42 U.S.C. § 2000e-2(a)(1) (emphasis added).

[41] *Qin v. Vertex, Inc.*, 100 F.4th 458, 472 (3d Cir. 2024) (quoting *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990)); *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (per curiam) ("The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin.") (internal quotations removed).

[42] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025) (applying the *McDonnell Douglas* framework to a Title VII disparate treatment claim holding Title VII does not impose a heightened evidentiary standard on majority-group plaintiffs at the first step of the *McDonnell Douglas* framework).

[43] *Qin*, 100 F.4th at 473 (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). Discrimination claims under Title VII, the Pennsylvania Human Relations Act, and the Philadelphia Fair Practices Ordinance under the same framework. *Id.* at 470, n.2 (Title VII and Pennsylvania Human Relations Act claims analyzed together because they fall under the same analytical framework); *Fields v. Am. Airlines, Inc.*, 696 F. Supp. 3d 66, 94, n.19 (E.D. Pa. 2023) (employment discrimination under Title VII, the Pennsylvania Human Relations Act, and the Philadelphia Fair Practices Ordinance are analyzed coextensively).

[44] *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

[45] *Qin*, 100 F.4th at 474 (citing *Makky*, 541 F.3d at 214).

[46] *Id.*

[47] *Id.* at 474–75 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

[48] *Fuentes*, 32 F.3d at 763 (citing *Burdine*, 450 U.S. at 253).

[49] *Hennessey v. Dollar Bank, FSB*, 833 F. App'x 961, 966 (3d Cir. 2020) (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995)).

[50] *Fowler v. AT&T, Inc.*, 19 F.4th 292, 303 (3d Cir. 2021).

[51] *Id.*

[52] ECF 26-2, Pirolli SUMF ¶ 69; ECF 25-3, Appx. 89, Petri N.T. at 63-64.

[53] *Qin*, 100 F.4th at 473 (quoting *Makky*, 541 F.3d at 214).

[54] ECF 26-2, Pirolli SUMF ¶ 30; ECF 25-3, Appx. 85, Petri N.T. at 45.

[55] ECF 26-2, Pirolli SUMF ¶¶ 52–54, 57; ECF 26-8, Appx. 176–77, Rodriguez N.T. 41–43. Former Director Rodriguez believed Mr. McGuire should have been promoted to the Director of Finance position "many, many, many directors of financing ago. … But once Barry Kavitsky was no longer there, [Mr. McGuire] should have taken that position." ECF 26-8, Appx. 177. Rodriguez N.T. 43–44. We infer the Authority promoted Barry Kavitsky, a man, into the director of finance position over Mr. McGuire at some unidentified time—undercutting Mr. Pirolli's argument the Authority promotes less qualified women over more qualified men—and former Director Rodriguez believed the Authority should have promoted Mr. McGuire rather than a woman once Mr. Kavitsky left the position.

[56] ECF 26-2, Pirolli SUMF ¶ 57; ECF 26-8, Appx. 177, Rodriguez N.T. 46.

[57] ECF 26-2, Pirolli SUMF ¶¶ 55–56; ECF 25-2, Appx. 42, Pirolli N.T. 165.

[58] ECF 25-2, Appx. 42, Pirolli N.T. 164–65.

[59] *Fuentes*, 32 F.3d at 765 (citations omitted) (footnote omitted).

[60] ECF 26-1, Response to Authority SUMF ¶ 69.

[61] ECF 26-2, Pirolli SUMF ¶ 227.

[62] ECF 26-2, Pirolli SUMF ¶ 136; ECF 25-4, Appx. 162, Wheeler N.T. 118.

[63] ECF 25-4, Appx. 162, Wheeler N.T. 118.

[64] *Wharton v. Danberg*, 854 F.3d 234, 244 (3d Cir. 2017).

[65] ECF 26-2, Pirolli SUMF ¶ 234.

[66] *Id.* ¶¶ 234-241.

[67] *Id.*

[68] *Maull v. Div. of State Police*, 39 F. App'x 769, 774 (3d Cir. 2002).

[69] *Russell v. Vanguard Grp.*, No. 04-3269, 2006 WL 2077010, at *3 (E.D. Pa. July 24, 2006) (granting summary judgment in favor of employer on gender and age discrimination claims finding allegations of deficiencies in the hiring process, including failure to post the position in violation of employer's policy, without a "cogent argument" as to how the employer's failure to post the position undermined the employer's reason for choosing a man based on his experience) (collecting cases).

[70] ECF 26-2, Pirolli SUMF ¶¶ 85–88.

[71] *Id.* ¶ 244.

[72] *Id.* ¶ 244–252, ECF 26-9, Appx. 337, N.T. Miller at 41–44.

[73] ECF 26-2, Pirolli SUMF ¶¶ 227–230.

[74] *Fuentes*, 32 F.3d at 765.

[75] ECF 26-2, Pirolli SUMF ¶ 207 (emphasis added).

[76] *Id.* ¶ 208; ECF 26-6, Appx. 77, 85, Petri N.T. at 16, 48.

[77] ECF 26-20, Appx. 508, Tolson N.T. at 71–72.

[78] ECF 26-20, Appx. 508, Tolson N.T. at 73.

[79] ECF 26-20, Appx. 508, Tolson N.T. at 73–74.

[80] ECF 26-20, Appx. 508, Tolson N.T. at 74–75.

[81] ECF 26-2, Pirolli SUMF ¶ 209.

[82] ECF 26-10, Appx 384, O'Connor N.T. at 17.

[83] ECF 26-10, Appx 384, O'Connor N.T. at 17–18. Deputy Executive Director O'Connor confirmed her reference to the "committee" means the interview panel. *Id.*

[84] *Id.*

[85] ECF 28-18, Appx. 456, Smith N.T. 19–20.

[86] ECF 26-18, Appx. 456–57, Smith N.T. 20–21.

[87] *Compare* ECF 25-5, Appx. 255–58 *with* ECF 25-5, Appx. 276–78.

[88] ECF 26-9, Appx. 340, Miller N.T. at 55–56.

[89] 779 F. App'x 929 (3d Cir. 2019).

[90] *Id.* at 932 (quoting *Fuentes*, 32 F.3d at 765).

[91] *Yoho v. Bank of New York Mellon Corp.*, No. 17-917, 2020 WL 7336579, at *9 (W.D. Pa. Dec. 14, 2020), *aff'd* No. 21-1071, 2022 WL 296637 (3d Cir. Feb. 1, 2022).

[92] *Id.*

[93] No. 03-4704, 2005 WL 1971884, at *6 (E.D. Pa. Aug. 16, 2005).

[94] *Id.* at *6.

[95] *Fuentes*, 32 F.3d at 765.

[96] Entering judgment in favor of the Authority on Mr. Pirolli's Title VII claim moots the Authority's arguments Mr. Pirolli's claims under the Pennsylvania Human Relations Act and the Philadelphia Fair Practices Ordinance fail for the same reasons as his Title VII discrimination claim, the Philadelphia Fair Practices Ordinance claim is not exhausted, and punitive damages cannot be recovered against the Authority.